In re Sun Healthcare Group, Inc. )
SECURITIES LITIGATION )
)
)

This Document Relates to
Master File No. Civ. 99-269 MV/LCS-
ACE
CONSOLIDATED WITH:
CV 99-319; CV 99-336;
CV 99-369; CV 99-418; CV 99-423;
CV 99-424; CV 99-439; **CV 99-459;**
CV 99-460; CV 99-478; CV 99-508

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant's Motion to Dismiss the

Consolidated Amended Complaint [**Doc. Nos. 54 & 55**]. The Court, having reviewed the

motion, briefs, relevant law, and being otherwise fully advised, finds that the motion is well-

taken and will be **GRANTED with prejudice**.

## BACKGROUND

On a motion to dismiss, the Court "must accept all well-pleaded allegations of the

complaint as true and must construe them in the light most favorable to the plaintiff." Grossman

v. Novell, 120 F.3d 1112, 1118 (10th Cir. 1997) (quoting Roman v. Cessna Aircraft Co., 55 F.3d

542, 543 (10th Cir. 1995)). Therefore, the following factual background is derived from

Plaintiffs' allegations in the Consolidated Amended Complaint [**Doc. No. 27**] ("Complaint").

Sun Healthcare Group, Inc. ("Sun") is one of the largest full-service, long-term healthcare

providers in the United States and receives a substantial amount of its revenues from Medicare

patients. Following the Balanced Budget Act of 1997 ("BBA"), the federal Health Care Financing Administration ("HCFA") issued new reimbursement rates for post-hospital, extended-care services, primarily skilled nursing facilities ("SNFs"), on May 12, 1998. These new rates, called the Prospective Payment System ("PPS"), provide a per-diem flat rate for Medicare services that replaced the previous reimbursement system in which Medicare had paid for the cost of reasonable care, routine care, capital, and ancillary service costs. Sun converted to these new rates on January 1, 1999.

Because the new per-diem flat payment was markedly below the previous total of separate payments, Sun experienced a significant decrease in revenues. Sun was particularly affected by the BBA because Medicare constituted a much higher percentage of its revenues as compared to other nursing facilities. The BBA also curbed Medicare payments for various ancillary services, such as physical, speech and respiration rehabilitation therapy, and pharmaceutical services, which also detrimentally affected Sun's revenues from its extensive network of contract service providers. Moreover, Sun suffered from the decrease in Medicare reimbursement for its chain of rehabilitation hospitals. Sun ultimately filed for bankruptcy in 1999.

In 1997 Sun had engaged in a strategy to expand its presence in the nursing-care industry by acquiring Recency Health Services. In June 1998 Sun subsequently acquired Retirement Care Associates ("RCA") and its subsidiary Contour Medical, Inc. ("Contour") with 7.6 million shares of Sun stock. The total amount of shares paid for RCA and Contour was dependent on the value of Sun stock during the 20 trading days prior to the closing. RCA converted to the new PPS rates on July 1, 1998.

2

A class of plaintiffs, who acquired common stock of Sun from June 2, 1998, through February 1, 1999 (the "Class Period"), filed a Consolidated Amended Complaint [**Doc. No. 27**] on September 10, 1999, alleging violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (Count I) and violations of Section 20 of the Exchange Act (Count II). In Count I, Plaintiffs allege that Defendants Andrew L. Turner, Mark G. Wimer, and Robert D. Woltil, who serve as executive officers of Sun, made or approved several materially false and misleading statements or omissions during the Class Period in press releases, interviews, statements to analysts and SEC filings regarding the effect of the new federal health care legislation on Sun. Additionally, Plaintiffs allege that Defendant Woltil, as Chief Financial Officer, signed materially false and misleading Form 10-Q financial reports and sold 15,677 shares of Sun (valued at over $90,000) while in possession of material, adverse, non-public facts about Sun. In Count II, Plaintiffs allege that by virtue of Defendants' positions as controlling persons, they are subject to the control person liability provisions of Section 20 of the Exchange Act.

On December 5, 2000, Defendants filed a Motion to Dismiss the Consolidated Amended Complaint [**Doc. No. 54 & 55**] pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Plaintiffs filed their Opposition to Defendants' Motion to Dismiss [**Doc. No. 62**] on February 2, 2001, and Defendants replied [**Doc. No. 65**] on March 9, 2001. On September 25, 2001, the Court heard oral arguments on the motion.

# STANDARD

A court should grant a motion to dismiss pursuant to Rule 12(b)(6) "only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief." Grossman, 120 F.3d at 1118 (10th Cir. 1997) (quoting Roman v. Cessna Aircraft Co., 55 F.3d 542, 543 (10th Cir. 1995)). The Court "must accept all well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." Id. In order to state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must allege: "(1) a misleading statement or omission of a material fact; (2) made in connection with the purchase or sale of securities; (3) with intent to defraud or recklessness; (4) reliance; and (5) damages." Id.

Prior to the passage of the PSLRA, Rule 9(b) of the Federal Rules of Civil Procedure governed the pleading requirements for scienter. City of Philadelphia v. Fleming Cos., 264 F.3d 1245, 1258 (10th Cir. 2001). However, "the enactment of the PSLRA in 1995 marked a bipartisan effort to curb abuse in private securities lawsuits[, mandating] a more stringent pleading standard for securities fraud actions in general, and for scienter allegations in particular." Id. (citation omitted). The PSLRA requires that:

> (1) [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

> (2) [T]he complaint shall, with respect to each act or
> omission alleged to violate this chapter, state with particularity
> facts giving rise to a strong inference that the defendant acted with
> the required state of mind.

15 U.S.C. § 78u-4(b)(1) (2) (1997).

In the Tenth Circuit, "the appropriate level of scienter in securities fraud cases is a mental state embracing intent to deceive, manipulate, or defraud, . . . which includes recklessness." Fleming, 264 F.3d at 1259 (citations omitted). "[R]ecklessness is defined as conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Id. at 1260 (citations omitted).


# DISCUSSION

## I.     Allegedly False and Misleading Statements Not Actionable as a Matter of Law

Before engaging in an analysis of the sufficiency of Plaintiffs' scienter pleadings, the Court must first determine whether any of Defendants' allegedly false and misleading statements are not actionable as a matter of law. Defendants assert that certain statements are not actionable because they are (1) subject to the "safe harbor" provisions of the PSLRA; (2) protected by the "bespeaks caution" rule; (3) immaterial statements of corporate optimism or "puffing;" (4) analyst reports without sufficient entanglement; and (5) outside of the Class Period. These arguments are discussed in turn below.

### A. "Safe Harbor" Provisions of the PSLRA

The PSLRA provides a "safe harbor" for certain forward-looking statements, thus

immunizing them from liability if the following requisite criteria is met: (1) "the forward looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or immaterial;" or (2) "the plaintiff fails to prove that the forward-looking statement . . . was made with actual knowledge . . . that the statement was false or misleading . . . ." 15 U.S.C. § 78u-5(c)(1) (1997).

A "forward-looking statement" is defined, in pertinent part, as a statement that contains (1) a "projection of revenues, income, . . . or other financial items;" (2) the "plans and objectives of management for future operations;" or (3) "future economic performance." 15 U.S.C. § 78u-5(i)(1)(A)–(C).

Defendants argue that the following statements are "forward-looking" and fall under the protection of "safe harbor":

- "We continue to believe that the new prospective payment system will make our industry more efficient. . . . We also continue to believe that PPS will favor Sun's operating model." (Compl. ¶ 86.)

- "Sun plans to integrate promptly the operations, facilities and personnel of Sun and RCA following the RCA Merger." (Id. ¶ 51.)

- "Sun expects to incur a charge of approximately $30 million in connection with the [RCA] Mergers . . . ." (Id.)

- "While the industry's transition to Medicare PPS continues to present both challenges and uncertainties, Sun continues to demonstrate both its leadership and its preparedness for the new operating environment." (Id. ¶ 62.)

- "The company noted that it expects both total revenues and pre-tax margins from contract therapy services to be unchanged or improved during the quarter." (Id. ¶ 73.)

- "The creation of a single ancillary services division, and the elimination of separate pharmacy and rehabilitation divisions, will promote an integrated approach to the

6

provision of ancillary services. It will also improve Sun's ability to succeed in marketing SunSolution, an all-inclusive service product that is our primary strategy for expanding our revenue under PPS." (Id. ¶ 81.)

Statements in Paragraphs 51, 81, and 86 of the Complaint ("Compl. Par(s).") are clearly forward-looking as defined by the PSLRA because they either contain a "projection of financial items" (including revenues), "plans and objectives of management for future operations," or a "statement of future economic performance." 15 U.S.C. § 78u-5(i)(1)(A)–(C). The statement found in Compl. Par. 62 is not forward-looking because stating that the transition to "Medicare PPS continues to present both challenges and uncertainties" and that "Sun continues to demonstrate both its leadership and preparedness" describes a present, not future, condition. Moreover, Plaintiffs allege that the false statements in Compl. Par. 73 were assertions that Sun had "continued to reduce its cost of operations" and "instituted new operational procedures to neutralize" the impact of PPS, not the revenue expectations for contract therapy services, as cited by Defendants. The allegedly false and misleading statements in Compl. Pars. 62 and 73 do not convey any future projection, plan, objective, or estimate of future economic performance within the PSLRA's definition and, thus, are not forward-looking.

Establishing that some of the statements are forward-looking does not, however, end the analysis. In order to be eligible for safe harbor, the forward-looking statements must either (1) be identified as forward-looking and be accompanied by meaningful cautionary language; (2) be immaterial; or (3) not be made with actual knowledge that the statement was false or misleading. 15 U.S.C. § 78u-5(c)(1). Because Defendants do not argue that the forward-looking statements are immaterial, the Court will address only the first and third requirements for safe harbor.

Plaintiffs correctly assert that the above statements were not properly "identified as a

7

forward-looking statement" pursuant to 15 U.S.C. § 78u-5(c)(1)(A)(i) and, thus, do not qualify for safe harbor under that provision. See Helwig v. Vencor, Inc., 251 F.3d 540, 558 (6th Cir. 2001) (noting that some SEC filings and press releases lacked the designation of "forward-looking" as required by the PSLRA); Robertson v. Strassner, 32 F. Supp. 2d 443, 450 (S.D. Tex. 1998) (finding a press release not to qualify for safe harbor because it was not identified as "forward-looking"). However, the forward-looking statements at issue can also qualify for safe harbor if Plaintiffs fail to prove that the statements were "made with actual knowledge" of being false or misleading. 15 U.S.C. § 78u-5(c)(1)(B)(i). "Actual knowledge" is a higher level of scienter than the "recklessness" required by the pleading standards of the PSLRA. See Harold S. Bloomenthal and Samuel Wolff, Securities and Federal Corporate Law § 15:15, at 15-43 (2d ed. 2000). Because Plaintiffs have failed to sufficiently plead scienter in the Complaint, as discussed in more detail below, they have concomitantly failed to prove that Defendants made the forward-looking statements with "actual knowledge" that they were false and misleading.[1] Therefore, the forward-looking statements in Compl. Pars. 51, 81, and 86 are not actionable as a matter of law.

## B. "Bespeaks Caution" Rule

Alternatively, the Court may find forward-looking statements non-actionable as a matter of law pursuant to the judicially crafted "bespeaks caution" rule. "Forward-looking presentations are also considered immaterial when the defendant has provided the investing public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter

---

[1] The Court notes that even if Plaintiffs had sufficiently pleaded scienter based on a "recklessness" standard, it would still be necessary to determine whether there was "actual knowledge" for purposes of safe harbor.

8

of the statements at issue to nullify any potentially misleading effect." Grossman, 120 F.3d at 1120. Moreover, "the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge." Id. (quoting In re Donald Trump Sec. Litig., 7 F.3d 357, 371 (3d Cir. 1993)). "[C]ourts have not required cautionary language to be in the same document as the alleged misstatement or omission," id. at 1122, but "[r]emote cautions are less likely effectively to qualify predictions contained in separate statements," id. at 1123.

Defendants have not specified which allegedly false and misleading statements fall within the "bespeaks caution" rule. However, since this rule is applicable only to forward-looking statements, see id. at 1120, the Court will assume that Defendants consider the same statements eligible for "safe harbor" to also be eligible for protection under the "bespeaks caution" rule. Defendants argue that the "total mix" of information available to the investing public contained sufficient cautionary language and risk disclosures from Sun's SEC filings, as well as publicly available information. The Court agrees that risk disclosures, though not publicly available information,[2] sufficiently limited the effect of the forward-looking statements in Compl. Pars. 51, 81, and 86 and finds the "bespeaks caution" rule to also protect Defendants from liability for those statements.

Plaintiffs allege that Sun estimated its costs from the merger with RCA in its Form S-4

_____

[2]The forward-looking statements specifically addressed the costs associated with the RCA merger, the marketing of SunSolution, and Sun's transition to PPS. On the contrary, the public information available at the time Defendants made these statements concerned PPS and the new federal health care legislation generally and were not sufficiently substantive and tailored to Defendants' predictions to limit their effect. See Grossman, 120 F.3d at 1120.

Joint Proxy Statement/Prospectus/Information Statement, filed June 2, 1998, and failed to indicate any problems associated with the conversion of RCA to the new payment system. (Compl. ¶ 51.) However, in its Form S-4 Registration Statement, filed July 31, 1998, Sun went into great detail about the BBA and the possible adverse effects of PPS on its operations and revenues. (Def.'s Request for Judicial Notice in Supp. of Mem. of P. & A. in Supp. of Mot. to Dismiss ("RJN") Ex. U at 18–24.) More importantly, Sun warned investors about the difficulty of integrating RCA and the risks related to the merger, and that its ability to manage its growth was dependent on the market price of the company's common stock, which had been used to fund acquisitions and was subject to the volatilities of the Medicare reimbursement system. (Id. at 24–28.) Such cautionary language was sufficiently substantive and tailored to Defendants' projections to satisfy the "bespeaks caution" rule.

The other allegedly false and misleading statements occurred within a few weeks of each other in October 1998: (1) Defendant Wimer discussed how Sun's integrated approach would improve the marketing of SunSolution, which was its primary strategy to expand revenues under PPS (Compl. ¶ 81); and (2) in connection with the 1998 third quarter earnings announcement, Defendant Turner asserted that PPS would favor Sun's operating model as proven by the successful marketing of its SunSolution product (Id. ¶ 86). Yet, both of these statements were tempered by several risk disclosures in Sun's 10-Q Quarterly Report, filed on November 17, 1998. (See RJN Ex. G.)

The report warned that Sun's revenues would be "significantly affected by the federally established per diem rate" and that it expects the new rate "will generally be less" than the previous cost-based reimbursement system, specifically noting that "the transition to PPS for

10

RCA facilities on July 1, 1998 negatively impacted the Company's earnings for the quarter ended September 30, 1998." (Id. at 41.) The report further stated that Sun established the SunSolution product in response to PPS but that there "can be no assurance that there will be a market for the SunSolution products and services or whether a change in the demand for the Company's services following the imposition of PPS will not adversely affect the Company's revenues." (Id.)

In light of the fact that Sun had not even transitioned to PPS at the time the statements were made, the Court finds the cautionary language in the 10-Q Report to have provided sufficient risk disclosures to limit the forward looking statements in the press releases. The Grossman court distinguished cautions "contained in formal documents of considerable legal weight" from "allegedly misleading predictions . . . contained in less formal press releases . . . which were all closely proximate in time to the [formal] statement and . . . were obviously directly related to the transactions described in great detail in the [formal] statement." 120 F.3d at 1123. Similarly, the 10-Q Report went into much greater detail about the impact of PPS on Sun's revenues under the heading "Effects From Changes in Reimbursement" and explained why there could be no assurances regarding the SunSolution product (see RJN Ex. G at 41), whereas the press releases gave more general optimistic projections on the company's ability to handle the implementation of PPS (Compl. ¶¶ 81, 86).

## C. Statements of "Corporate Optimism," "Soft" Information, or "Mere Puffing"

"Statements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification. Vague optimistic statements are not actionable because reasonable investors do not

rely on them in making investment decisions." Grossman, 120 F.3d at 1119 (footnote omitted). Because such statements do not significantly alter the "total mix" of information available to the market, see id. (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)), they are not material and, thus, fail to satisfy one of the elements of a Section 10(b) and Rule 10b-5 violation.

Courts have found the following types of statements to be "mere puffing": experiencing "substantial success" in integrating operations. Grossman, 120 F.3d at 1121; a merger "was moving faster than we thought" and "presented a compelling set of opportunities," id. (quotations omitted); expecting "network applications will quickly reshape customer expectations," id.; being prepared for the challenge of a competitive market, In re Software Publishing Sec. Litig., No. C93-20246, 1994 WL 261365, at *4–*5 (N.D. Cal. Feb. 2, 1994); and being "poised" to continue success in the future. Raab v. General Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993).

It is unclear which statements are considered by Defendants to be statements of "corporate optimism" and, thus, non-actionable. Defendants claim that "[v]irtually all of the statements about which Plaintiffs complain are non-actionably vague, 'soft' statements of corporate optimism." (Def.'s Mem. of P. & A. in Supp. of Mot. to Dismiss ("Def.'s Mot.") at 21.) However, they only draw the following statements to the Court's attention as examples of corporate optimism:

- "Anytime there's turmoil, there's opportunity." (Compl. ¶ 8(b).)

- "Sun continues to demonstrate both its leadership and its preparedness for the new operating environment." (Id. ¶ 62.)

- "Sun [is] well positioned to thrive under the new PPS." (Id. ¶ 87.)

- "We believe SHG is prepared for PPS . . . . We think [the Company's SunSolution product] will give the company a unique competitive advantage." (Id. ¶ 84.)

12

The Court agrees with Defendants that the above statements are immaterial because they merely state "corporate optimism" and, therefore, are not actionable as a matter of law. It would be impossible to objectively verify such soft statements that merely convey the subjective assertions of the speaker. However, the Court notes that not all of the statements in Compl. Pars. 62 and 87 are "mere puffing." According to Compl. Par. 62, Defendant Turner also allegedly stated that "Sun's operating results for the quarter were among the best in the industry." Additionally, in Compl. Par. 87, Defendants allegedly stated that the "new PPS would benefit Sun's operating model because the Company controlled all of the ancillary services required by long-term residents" and that "[d]espite some certainty regarding the impact of PPS, Sun was still on track to have 1998 and 1999 EPS of $.91–$.92 and $1.00–$1.40, respectively." These statements go beyond the general optimistic assertions that characterize soft information. Rather, they provide specific, objective, and material information upon which a reasonable investor would rely.

Plaintiffs make much of the U.S. Supreme Court's finding, as interpreted by the Tenth Circuit, that "a statement as to beliefs or opinions . . . may be actionable if the opinion is known by the speaker at the time it is expressed to be untrue or to have no reasonable basis in fact." Grossman, 120 F.3d at 1120 n.6 (citing Virginia Bankshares v. Sandberg, 501 U.S. 1083, 1093–94 (1991)). However, as further explained below, Plaintiffs have failed to show that Defendants made their allegedly false and misleading statements with actual knowledge of falsity or in reckless disregard. Moreover, the Court does not find persuasive the contention that optimistic statements by corporate insiders are actionable because investors rely on statements by corporate insiders. This circular argument flies in the face of established Tenth Circuit doctrine

13

regarding corporate optimism. The key question is whether a particular statement was so vague as not to be relied upon by a reasonable investor, not simply whether or not a statement was made by an insider. Id. at 1119.

### D. Analysts' Statements Imputed to Defendants

In order to be liable for an independent analyst's report, Defendants must have "placed their imprimatur, expressly or impliedly on the analyst's projections." Greene v. Horizon/CMS Healthcare Corp., Civ. No. 97-114, 1998 U.S. Dist. LEXIS 12254, at *11 (D.N.M. July 13, 1998) (quoting In re Mesa Airline Secs. Litig., No. 94-690, slip. op. at 18 (D.N.M. May 31, 1996)). A defendant places an imprimatur on the analyst's report if he or she is sufficiently entangled with the report, rendering any predictions attributable to the defendant. Id. (citations omitted). A sufficient pleading of entanglement must: "(1) identify specific forecasts and name the insider who adopted them; (2) point to specific interactions between the insider and the analyst which gave rise to the entanglement; and (3) state the dates on which the acts which allegedly gave rise to the entanglement occurred." Id. (citing Mesa Airlines, No. 94-690, slip. op. at 19)).

Alleged false and misleading statements in reports by third-party analysts are found in Compl. Pars. 55–60, 64–65, 68–70, 75–76, 79–80, 83–84, 88, and 90–92. The Court finds that Defendants have not placed their imprimatur on any of these reports, except the Cavuto Business Report interview in Compl. Par. 60, and that they cannot be held liable for them as a matter of law. Of the numerous analyst reports included in the Complaint, only those found in Compl. Pars. 55, 60, and 92 identify the defendant to whom the statement is attributed and the specific date on which the analyst possibly interacted with the defendant. The other analyst reports

contain statements attributed to "Sun management," to a non-defendant,[1] or to no one at all, and fail to identify any specific interaction between the analyst and Defendants on a particular date.

The analyst reports in Compl. Pars. 55 and 92 fail to show an imprimatur placed by Defendants because Plaintiffs have not pleaded any entanglement whatsoever. Compl. Par. 55 refers to a Bear Stearns report written by analysts after speaking to Defendants Turner and Wimer on June 22, 1998. However, Plaintiffs' only allegation of entanglement is that Bear Stearns issued its report "[b]ased on Sun management's statements," (Compl. ¶ 55), which is clearly insufficient to constitute an imprimatur. Likewise, Compl. Par. 92 merely refers to a Bloomberg report of an address by Defendant Turner at a Robinson-Humphrey conference, thus failing to show any personal interaction between Turner and the Bloomberg reporter, let alone entanglement.

However, the Cavuto Business Report interview with Defendant Turner (id. ¶ 60) is actionable because Turner participated in the interview and his statements were published verbatim. Turner's obvious cooperation with the reporter during the interview demonstrates sufficient entanglement to place his imprimatur on the Cavuto Business Report article.

Plaintiffs argue that Defendants made materially false and misleading statements directly to the analysts and should be held liable for those statements that were repeated by the analysts to the investing public, directing the Court to Compl. Pars. 55, 57–58, 63, 68, 83, and 87–88. First of all, Defendants have never argued that the statements in Compl. Pars. 63 and 87 are non-actionable analyst reports. Plaintiffs' contention regarding the remaining statements are to no

---

[1]Compl. Par. 83 refers to a conversation between the analyst and Ken Noonan, President of SunSolution, who is not a named defendant in this action.

avail—the allegations simply do not provide enough sufficient detail to satisfy the pleading requirements of the PSLRA to "specify each statement alleged to have been misleading." 15 U.S.C. § 78u-4(b)(1).

The allegations cited by Plaintiffs specify the statements made by the analysts, <u>not</u> by Defendants. Defendants cannot be held liable within the strictures of the PSLRA for (1) speaking about Sun's operations and prospects (Compl.¶ 55), (2) communicating with analysts (<u>id.</u> ¶ 57), (3) providing information (<u>id.</u> ¶¶ 58, 88), or (4) being checked in with by analysts (<u>id.</u> ¶ 68).[4] Not once in any of any of these paragraphs of the Complaint do Plaintiffs specify the actual statements made by Defendants that were misleading. In order to hold Defendants liable for statements made by third-party analysts rather than themselves, fairness—as well as the law—calls for sufficient entanglement whereby the analysts' statements can be justly attributed to them. Plaintiffs have completely failed to make such a showing.

## E. Statements Outside the Class Period

"A defendant . . . is liable only for those statements made during the class period." <u>In re International Business Machines Corp. Secs. Litig.</u>, 163 F.3d 102, 107 (2d Cir. 1998). "As the class period defines the time during which defendants' fraud was allegedly alive in the market, statements made or insider trading allegedly occurring before or after the purported class period are irrelevant to plaintiffs' fraud claims." <u>In re Clearly Canadian Secs. Litig.</u>, 875 F. Supp. 1410, 1420 (N.D. Cal. 1995).

The Class Period in this action is June 2, 1998, through February 1, 1999. The Complaint

---

[4]The Court notes again that Compl. Par. 83 refers to a conversation with Ken Noonan, who is not a named defendant.

specifies Paragraphs 49–96 as containing false and misleading statements during the class period, so it is unclear why Defendants assert there are alleged misrepresentations in other sections of the Complaint. Regardless, the Court finds that any allegedly false and misleading statement made outside the class period is not actionable as a matter of law. This includes Compl. Par. 54, which contains statements made on May 21, 1998, that was not within the Class Period.[5]

## II.    Scienter Pleadings Under PSLRA

The PSLRA raised the pleading standards in a securities fraud case, requiring the plaintiff to "state with particularity facts giving rise to a <u>strong inference</u> that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). The Tenth Circuit recently issued an opinion, which for the first time established the following requisite showing of scienter in this circuit under the PSLRA's new standard: "(1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors." <u>Fleming</u>, 264 F.3d at 1261. The knowledge requirement can be "satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." <u>Id.</u> The recklessness standard is also defined as "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." <u>Id.</u> at 1265 (quoting <u>Novak v.</u>

---

[5]The Court notes that Compl. Par. 73 refers to a press release, dated September 28, 1999, which is also not within the Class Period. However, in all likelihood, the date was merely a typographical error and should refer to the year 1998 and is, thus, so considered.

Kasaks, 216 F.3d 300, 308 (2d Cir. 2000)).

The Fleming court also gave its position on a current circuit split regarding whether or not "motive and opportunity" is a sufficient demonstration of scienter under the heightened pleading standard of the PSLRA. Rather than stating definitively that "motive and opportunity" could or could not satisfy the pleading requirements, the Tenth Circuit opted to join the First, Sixth, and (arguably) the Eleventh Circuits' determination that "courts must look at the totality of the pleadings to determine whether the plaintiffs' allegations permit a strong inference of fraudulent intent. Allegations of motive and opportunity may be important to that totality, but are typically not sufficient in themselves to establish a 'strong inference' of scienter." Id. at 1262 (citing Greebel v. FTP Software, Inc., 194 F.3d 185 (1st Cir. 1999); Helwig v. Vencor, Inc., 251 F.3d 540 (6th Cir. 1999); Bryant v. Avado Brands, Inc., 187 F.3d 1271 (11th Cir. 1999); In re Comshare Inc. Sec. Litig., 183 F.3d 542 (6th Cir. 1999)).

Plaintiffs allege that Defendants knowingly or recklessly committed securities fraud by making materially false and misleading statements or omissions to the investing public and by issuing materially false and misleading financial reports. The Court analyzes the sufficiency of both allegations under the PSLRA's pleading standard below.

## A. Allegedly False and Misleading Statements or Omissions

After finding several statements non-actionable as a matter of law, the remaining false and misleading statements are alleged in Compl. Pars. 49–50, 52–53, 60, 62–63, 66, 71–73, 77, 87, 93–94. These allegedly false and misleading statements, found in SEC filings, press releases, news articles, conference calls, and a published interview, generally assert that (1) PPS's effect on Sun's operating results and revenues was uncertain; (2) Sun would offset any negative effects

from PPS by reducing costs, increasing efficiency, and marketing the SunSolution product; (3) Sun would like to sell stock to decrease its debt, but market prices in October 1998 were less than its value of $25; and (4) sales of SunSolution and Sun's operating model benefitted from the new PPS rules due to early and intensive preparation.

Plaintiffs argue that these statements were false and misleading because in reality Sun's profit margins under PPS were substantially lower, revenues from ancillary services decreased dramatically, its position was worse than competitors due to a market glut of ancillary services, and its merger with RCA was troubled due to efforts to comply with federal regulations. Moreover, Plaintiffs allege that although Defendants knew or should have known that RCA was unprepared for the PPS conversion, they did not adequately prepare for the transition and failed to disclose this lack of preparation to the public.

The Court is not persuaded by Plaintiffs' arguments and holds that the Complaint does not "state with particularity facts giving rise to a strong inference" of scienter to withstand a motion to dismiss. All of the allegedly false and misleading statements were made prior to Sun's conversion to PPS on January 1, 1999; thus, Defendants could not possibly have known the transition's effect on the company with certainty before that time.[6] To hold Defendants liable for failing to make absolute statements regarding the detrimental impact of PPS before the new system went into effect is a prime example of the "fraud by hindsight" of which the Tenth Circuit

---

[6]Plaintiffs' reliance on the fact that RCA converted to PPS earlier than Sun in July 1998 does not remedy the deficiency in their pleadings. Defendants disclosed in public filings that "the transition to PPS for RCA facilities . . . negatively impacted the Company's earnings . . . ." (RJN Ex. G at 42, Ex. H at 34.) Nowhere do Plaintiffs explain why Sun's transition to PPS would mirror that of RCA despite efforts to counter any negative impact from PPS.

explicitly disapproved. See Fleming, 264 F.3d at 1260 ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."(quoting Novak, 216 F.3d at 309)).

All that Plaintiffs have shown is that the HCFA issued lower per diem rates and that Sun subsequently asserted that it could neutralize the potentially negative impact of PPS by reducing costs and providing a new product called SunSolution. Plaintiffs do not identify any specific, factual evidence of financial harm that was not disclosed by Defendants when they made the statements at issue, nor do Plaintiffs explain why Defendants should not have reasonably believed that reducing costs or marketing a new product in anticipation of PPS would not be successful. Instead, Plaintiffs merely point to information that was publicly available to any investor at that time, and was in fact repeatedly included in Sun's SEC filings: that the rates under PPS were lower than the previous reimbursement system, and that a significant portion of Sun's revenues was dependent on Medicare. To allege that Defendants should have disclosed the certain detrimental effect of PPS prior to its full implementation, and despite efforts made to counter that effect, is pleading fraud by hindsight.[7]

Plaintiffs make much of Defendants' alleged knowledge of the problems experienced by SunRise Nursing Home facilities ("SunRise") in Oregon when it allegedly operated under a

---

[7]Defendant's argument that scienter can be inferred from Defendants' senior positions in Sun is equally unavailing. "[A]llegations that a securities fraud defendant, because of his position within his company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts] . . . have determined to be inadequate . . . .'" Fleming, 264 F.3d at 1264 (citations omitted).

system similar to PPS.[8] Yet, Plaintiffs completely fail to specify why the failures of a regional facility would be relevant to the well-being of the national company as a whole. They do not explain how the Oregon system was comparable to PPS, how SunRise was comparable to Sun, and whether SunRise made efforts similar to Sun to combat the negative impact of the per-diem system. If SunRise is to be the heart of Plaintiffs' scienter pleadings, they must allege more than the mere fact that the facility "operated under a similar per-diem payment schedule" and lost money "[d]espite reorganization and cost-cutting efforts." (Compl. ¶ 6.) Without more detail, it is impossible to make any meaningful comparison between Sun and SunRise to discern Defendants' alleged scienter.

In determining that Plaintiffs have not established a "strong inference of scienter" in their pleadings, the Court finds it particularly noteworthy that they have utterly failed to present a logical motive for Defendants' alleged fraud. While "motive and opportunity" alone is not typically sufficient to establish scienter, the lack of motive is an element of the "totality of the pleadings" which the Court must consider. See Fleming, 264 F.3d at 1262. Moreover, "[c]ourts have looked with skepticism at allegations of wrongdoing in cases where there was no apparent motive for it." Oppenheimer v. Novell, Inc., 851 F. Supp. 412, 418 (D. Utah 1994) (citing Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986)). Plaintiffs assert that insider trading and Sun's acquisition of RCA provide two separate motives from which scienter

---

[8] The Court notes Defendants' contention that the Oregon facility does not exist. Because this is a motion to dismiss, however, the Court must accept Plaintiffs' allegations as true. See Grossman, 120 F.3d at 1118. Nevertheless, the Court advises both Plaintiffs and Defendants of the potential sanctions under Rule 11 of the Federal Rules of Civil Procedure if it finds any of their assertions regarding the Oregon facility to be in bad faith.

can be inferred; yet, both are entirely baseless.

In order to infer scienter, insider stock activity must be "unusual," Acito v. Imcera Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995), and "[a]ny remote inference of bad faith arising from the defendants' stock sales is completely dispelled by the defendants' overall pattern of conduct," In re Apple Computer Secs. Litig., 886 F.2d 1109, 1118 (9th Cir. 1989). In this case, Plaintiffs have not established that Defendant Woltil's sale of stock was unusual in any way in light of his overall pattern of trading activity. Plaintiffs also have not alleged unusual trading activity by any other Sun executive. Indeed, Defendants argue that Sun's insiders collectively purchased eight times as many shares as they sold during the Class Period. (Def.'s Mot. at 13.) The Court's inability to find sufficient scienter allegations is, therefore, "especially compelling in the absence of any allegations of insider trading or self-dealing." In re United Telecomms. Inc., Secs. Litig., 781 F. Supp. 696, 703 (D. Kan. 1991).

The argument that Defendants were motivated to commit fraud in order to inflate stock prices during the RCA acquisition is equally untenable. Plaintiffs utterly fail to explain why Defendants would go through the elaborate effort of misleading investors into purchasing inflated stock, only to use the proceeds to acquire a company that is subject to the same per diem rates with such devastating consequences. If one follows Plaintiffs' logic, not only did Defendants knowingly add to Sun's losses under PPS by acquiring RCA, but they also accelerated the timing of the losses since RCA converted to the new system six months earlier. "In looking for a sufficient allegation of motive, [the court] assume[s] that the defendant is acting in his or her informed economic self-interest." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994) (citation omitted). It is difficult to discern how Defendants could be acting

22

in their self-interest by holding or purchasing artificially inflated Sun stock, as well as acquiring a company that they allegedly knew was doomed for failure under PPS. Motive, therefore, is entirely absent from Plaintiffs' Complaint.

## B. Allegedly False Financial Statements

The Tenth Circuit has explicitly held that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim . . . . Only where such allegations are coupled with the evidence that the violation or irregularities were the result of the defendant's fraudulent intent to mislead investors may they be sufficient to state a claim." Fleming, 264 F.3d at 1261 (citation omitted). In this case, Plaintiffs allege that Defendants caused Sun to falsely report its earnings in violation of generally accepted accounting principles ("GAAP") and the securities laws by failing to record expenses and losses in the quarters when they were incurred, improperly accounting for the RCA acquisition as a pooling of interest instead of a purchase, and improperly accounting for the goodwill from the RCA acquisition. (Compl. ¶¶ 107–23.) Plaintiffs further assert that Sun's restatement of its previously issued financial statements evidences false reporting that subsequently misled the market. (Id. ¶¶ 118–19.)

As with the allegedly false and misleading statements, Plaintiffs' allegations in the Complaint regarding accounting violations do not sufficiently plead scienter. While Plaintiffs may have explained what the accounting violations are, they have not sufficiently demonstrated that Defendants falsely reported with the fraudulent intent to mislead investors. Moreover, the mere fact that Sun issued a restatement of its previous financial statements, without further

specificity of scienter, cannot constitute an actionable admission of fraud." To hold otherwise would subject every financial restatement to liability.

The Court is not persuaded by Plaintiffs' contention that "[r]ecent PSLRA decisions have found allegations much less specific than those set forth in the Complaint to constitute strong circumstantial evidence of conscious behavior" (Pls' Mem. of P. & A. in Opp'n to Def.'s Mot. to Dismiss ("Pls' Opp'n") at 14) since all of the cases they cite actually address more specific allegations of scienter with regard to accounting violations. The court in Chalverus v. Pegasystems, Inc. noted that a "defendant's failure to recognize revenue in accordance with GAAP does not, by itself, suffice to establish scienter" and that "the Court must determine whether the alleged GAAP violations, combined with other circumstances indicative of fraudulent intent, raise a strong inference that the defendants acted with scienter." 59 F. Supp.2d 226, 233-34 (D. Mass. 1999) (emphasis added). Thus, the court found the GAAP violations—"taken together" with the "magnitude of the overstatement," the "violation of an internal corporate policy," the omission of material information in a press release, and the defendants motives—to satisfy the "strong inference" requirement. Id. at 236.

In In re Microstrategy, Inc. Secs. Litig., the court found a strong inference of scienter from GAAP violations due to the simplicity of the violated accounting rules, the frequency of the violations, and the short amount of time needed to rectify the violations in the restatement. 115 F. Supp. 2d 620, 652 (E.D. Va. 2000). Likewise, the plaintiffs in In re Oxford Health Plans, Inc.

---

⁹While the Court appreciates Plaintiffs' inclusion of the APB Opinions as a resource for learning more about accounting principles, they seem to have overlooked D.N.M.LR-Civ. 10.6, which states that the "portions of the exhibit the party wishes to bring to the Court's attention must be highlighted in the original, the copy for the Court and copies to all parties."

Secs. Litig. not only alleged that the defendants improperly "represented to the public that the financial statements were in compliance with GAAP," but also that the defendants had knowledge of the unreliability of the data upon which those statements were based. 187 F.R.D. 133, 139 (S.D.N.Y. 1999). The Oxford court further noted as evidence of scienter that the defendant never restated its incorrect financial statements. Id.

The only allegations of scienter set forth by Plaintiffs are those already found to be deficient above and the accounting violations themselves. Without more specificity with respect to Defendants' fraudulent intent to mislead investors through false reporting of Sun's finances, Plaintiffs' allegations do not give rise to a "strong inference" of scienter, as required by the PSLRA.

## III. Insufficient Particularity in the Complaint

Because the Court holds that Plaintiffs have not established a "strong inference" of scienter, it does not find it necessary to address Defendants' further arguments that Plaintiffs failed to define the bases of their claims with specificity and failed to plead the factual bases for their "information and belief allegations."

## IV. Control Person Liability

"[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." Fleming, 264 F.3d at 1270–1 (quoting Maher v. Durango Metals, Inc., 144 F.3d 1302, 1305 (10th Cir. 1998)). Because Plaintiffs have not established a primary violation of the securities laws, the Court must likewise dismiss their allegations of control person liability.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss the Consolidated Amended Complaint **[Doc. Nos. 54 & 55]** is hereby **GRANTED with prejudice**.

Dated this 15th day of January, 2002.

_____
MARTHA VAZQUEZ
U. S. DISTRICT COURT JUDGE

Attorneys for Plaintiffs:
David A. Freedman
William S. Lerach
Andrew L. Barroway
Joseph H. Weiss

Attorneys for Defendants:
Kurt Wihl
Sara B. Brody